45 N.J. Super. 596 (1957)
133 A.2d 366
STATE OF NEW JERSEY, COMPLAINANT-APPELLEE,
v.
BERNARD P. BREZINA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Union County Court, Law Division, Criminal.
Decided June 13, 1957.
*598 Mr. Cuddie Davidson, Jr., Assistant Prosecutor and Mr. H. Russell Morss, Jr., Prosecutor, attorneys for plaintiff.
Messrs. Forman and Forman, attorneys for defendant.
*599 FELLER, J.C.C.
This is an appeal from a conviction of the defendant in the Cranford Township Municipal Court on a charge of driving a motor vehicle while under the influence of intoxicating liquor in violation of N.J.S.A. 39:4-50. A stenographic record having been made in that court, the appeal was heard de novo on the record. R.R. 8:7-5.
[The County Court here reviews the conflicting testimony and the operation and results of the Harger Drunk-O-Meter test at length.]

I.
N.J.S.A. 39:4-50.1 provides as follows:
"In any prosecution for a violation of section 39:4-50 of Title 39 of the Revised Statutes relating to driving a vehicle while under the influence of intoxicating liquor, the amount of alcohol in the defendant's blood at the time alleged as shown by chemical analysis of the defendant's blood, urine, breath, or other bodily substance shall give rise to the following presumptions:
1. If there was at that time 0.05 per centum or less by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was not under the influence of intoxicating liquor;
2. If there was at that time in excess of 0.05 per centum but less than 0.15 per centum by weight of alcohol in the defendant's blood, such fact shall not give rise to any presumption that the defendant was or was not under the influence of intoxicating liquor, but such fact may be considered with other competent evidence in determining the guilt or innocence of the defendant;
3. If there was at that time 0.15 per centum or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor.
The foregoing provisions of this section shall not be construed as requiring that evidence of the amount of alcohol in the defendant's blood must be presented, nor shall they be construed as limiting the introduction of any other competent evidence bearing upon the question whether or not the defendant was under the influence of intoxicating liquor. No chemical analysis, as provided in this section, or specimen necessary thereto, may be made or taken unless expressly consented to, or requested by, the defendant."
The most common form of making a chemical analysis to determine the percentage of alcohol in the blood is by means of the Drunk-O-Meter test.
*600 In the case of Hill v. State, 158 Tex. Cr. R. 313, 256 S.W.2d 93 (Tex. Crim. App. 1953), the court held that there are three essentials to the admissibility of evidence on the result of a Drunk-O-Meter test: (1) proof that the chemicals were compounded to the proper percentage for use in the machine; (2) proof that the operator and the machine were under the periodic supervision of one who has an understanding of the scientific theory of the machine; (3) proof by a witness who was qualified to calculate and translate the reading of the machine into the percentage of alcohol in the blood.
After reviewing the testimony of Officer Ryan and Mr. Brady, however, I am satisfied that the State has complied with the second and third essentials but has failed to comply with the first essential. Officer Ryan was sufficiently and adequately trained to operate the Drunk-O-Meter machine and to calculate and translate the reading of the machine. There is no proof, however, that the chemicals were tested or were compounded to the proper percentage for use in the machine. Officer Ryan testified that he had no knowledge when the chemicals were tested prior to August 6, 1956; that he used the chemicals in this particular machine prior to August 6, 1956, but that he did not know whether he used the chemicals that were placed in there after August 1 or the ones placed there prior to that time; that the Drunk-O-Meter machine was put in the department in November or December 1955; that he is not qualified in testing chemicals, although in training he received information as to how these chemicals should be tested and that he was told that the chemicals should be tested enough to maintain their purity, and that he did not know when the chemicals were brought in. He further testified that there was nobody in the department to check him and nobody ever tested him in the operation of the Drunk-O-Meter.
Mr. Brady testified that potassium permanganate decomposes; that it decomposes because of the peculiar properties of the oxide, so that the State Police and other law enforcement agencies that supplement their investigations with *601 the Drunk-O-Meter constantly keep a check on the potassium permanganate. The chemicals should be checked every 15 days. He further testified that where there was no evidence that the chemicals were changed or tested from November or December 1955 up to August 6, 1956, when defendant Brezina was tested, such a test was unfair both to the person who is operating the machine and the person who is being tested.
Mr. Brady further testified on cross-examination that potassium permanganate has a formula strength of 1 to 20, in dilution, and if it were diluted more than that it would take less time to reduce the alcohol. That means that there would be less volume of air, so the person would be in a "more drunk" condition; it would show more intoxication than actually existed. He said that potassium permanganate would be affected by sitting on a shelf in a bottle with a cap on it, by orthoreduction  that is, by reducing itself; that a manganese dioxide would form and it would become weaker.
Mr. Brady also testified that potassium permanganate is tested by actual titration  a process by which a normal amount of potassium permanganate will reduce the equivalent amount of oxalic acid, and he also said that the clinical picture is necessary in determining drunkenness. His testimony was not rebutted by the State.
In the case of Hill v. State, supra [158 Tex. Cr. R. 313, 256 S.W.2d 96], in which the conviction of a defendant was reversed, the court recited from the testimony of a Dr. Beerstecher, a Ph. D. in biochemistry, given in another case which was in part as follows:
"If the operator does not give the test properly, if he varies in it, then everything is out of kilter. The answers that might be indicated are worthless unless there has been exact accuracy in all of the procedure necessary to endeavor to reach a conclusion that would be shown by the machine.
I provide them with a solution of sulphuric acid and potassium permanganate. They are correct when I turn them over to the City Hall."
*602 It was pointed out in Hill v. State that Dr. Beerstecher had left the city three years prior to the giving of the test in that case. The court said:
"Officer Barnett testified further that he bought the chemicals from a pharmacist, but had no way of knowing if such chemicals actually received were of the strength ordered, or required, to accurately operate the machine. He also testified that if the solution or proper proportion of the chemicals in the machine was not exactly as required, the test would not be accurate."
Consequently, it is evident that in order to assure an accurate test by means of the Drunk-O-Meter, there must be proof that the chemicals were compounded to the proper percentage and strength for use in the machine. The courts have been moving along with the progress of science in the use of so-called scientific evidence. However, the courts must also guard the accused and the public against the use of this so-called scientific evidence when the use of the same does not bear the approval of scientists themselves unless every procedural step has been rigidly adhered to.
This, of course, in no way reflects on the Drunk-O-Meter as a means of obtaining evidence of intoxication; it merely points to the necessity of critical analysis for any possible operative deficiencies. Furthermore, it is not here intended in any way to discredit chemical testing. It is desired only to insert a word of caution as to the acceptance in evidence of such tests. In many cases where every procedural step is rigidly adhered to by the operator it will be extremely difficult or even impossible to determine any error in the final outcome of the test. Indeed, where there are no operative deficiencies there will probably be no deviation whatsoever from the defendant's true condition and his condition as shown by the test. See 4 Rutgers L. Rev. 523 (1950).
It may be that in this case the chemicals were tested and were properly compounded to the proper percentage for use in the machine, but there is no evidence to *603 this effect. This court can only take judicial notice of matters of common knowledge. The testing and proper compounding of chemicals for a Drunk-O-Meter test is not a matter of common knowledge; it is not a fact that may be regarded as forming part of the common knowledge of every person of ordinary understanding and intelligence. Palestroni v. Jacobs, 8 N.J. Super. 438 (Cty. Ct. 1950); Grand View Gardens v. Borough of Hasbrouck Heights, 14 N.J. Super. 167 (App. Div. 1951).
It is my opinion that there was no evidence introduced by the State to prove that the chemicals were tested or even compounded to the proper percentage for use in the machine when the defendant was given a Drunk-O-Meter test on August 6, 1956. Therefore, the results of the test cannot be considered in deciding this case.

II.
Officer Grickowski testified that he noticed a car weaving from side to side on Centennial Avenue, which car passed over the center line several times; that he followed the car, which stopped at the intersection of Lincoln Avenue; that a passenger got out, was staggering and was ordered back into the car; that as he (Officer Grickowski) was in the process of backing up the police car, the other car "took off"; that after about a block he overtook the car, succeeded in getting the driver's attention, pulled him over to the side, went over to the car and asked the driver for his registration; that he observed a strong odor of alcoholic liquor, asked the driver if he had been drinking and the driver replied in the affirmative; that the driver and his friend had been at Duke's Tavern and were looking for directions to go back to the American Legion Hall. The officer further testified that he asked the defendant to step out of the car, which he did, and that he walked 10 to 15 feet and staggered, and that he told him to get back in the car, which the defendant did, while he radioed his superior Lieutenant Miller who arrived with Officer Carl *604 Thompson; that the defendant consented to go to headquarters and submit to a Drunk-O-Meter test, which he did. There was also evidence that the defendant was polite, his eyes were bloodshot and his clothes disarranged, and that he consented in writing to the taking of the test at headquarters. All of the officers involved testified that it was their opinion that the defendant was intoxicated. The State contends that regardless of the results of the Drunk-O-Meter test, this evidence is sufficient to prove the defendant's guilt beyond a reasonable doubt. With this contention I cannot agree.
Whether a man is sober or intoxicated is a matter of common observation not requiring any special knowledge or skill, and is habitually and properly inquired into of witnesses who have occasion to see him and whose means of judging correctly must be submitted to the trier of the facts. Castner v. Sliker, 33 N.J.L. 95 (Sup. Ct. 1868). However, when this type of evidence is the only evidence submitted, it must be such as would not raise a reasonable doubt in a prosecution for driving an automobile while under the influence of intoxicating liquor.
In the case of State v. Myers, 136 N.J.L. 288, 290 (Sup. Ct. 1947), the court held:
"There was evidence upon which a conviction of driving while under the influence of intoxicating liquor could be based: The movements of the car which prosecutor was driving, the failure  as could be inferred  to apply the brakes, prosecutor's staggering walk, the strong smell of liquor about his person, his strange action in leaving immediately after the collision, his going to sleep soon after his arrival at a house which was not his home , the opinion formed by a witness at the scene of the accident. * * *"
All of these facts indicate that there was sufficient and adequate evidence to justify the conclusion that the defendant was guilty beyond a reasonable doubt.
In State v. Hunter, 12 N.J. Super. 128 (App. Div. 1951), it was held that the County Court, in convicting the defendant, disregarded all evidence of any test made in connection with the Harger Breath Test or Drunk-O-Meter Test and found the defendant guilty on other testimony *605 given by the officer who arrested the defendant and by the doctor who examined him. Examination of the record in that case reveals that the County Court's finding was not against the weight of evidence and was amply supported by the testimony relied upon. Thus in Hunter there was medical testimony in addition to the testimony of the police officer which provided sufficient evidence to justify the defendant's conviction.
In State v. Pichadou, 34 N.J. Super. 177 (App. Div. 1955), the court reaffirmed the rule that the average person of ordinary intelligence, although lacking special skill, knowledge and experience, but who has had an opportunity for observation, may testify whether a certain person was intoxicated; that in a prosecution for driving an automobile while under the influence of intoxicating liquor, the intoxicated condition of the defendant could be established in the absence of expert testimony. However, in that case the evidence was very convincing. The defendant drove off the left side of the highway familiar to her, striking two traffic signs which immobilized her car. She did not alight from the vehicle but remained seated behind the steering wheel, where the policeman discovered her. There was a pungent odor of alcohol on her breath. She was assisted into the police car and transported to police headquarters where the several witnesses noticed her speech to be "incoherent," "blurry," "slurred," and "as if her mouth was full of bubble gum." She was unable to use the telephone. She addressed the police officers as "darling," and staggered when she attempted to walk. The police commissioner asked her to stand erect and extend her right hand, close her eyes and touch her nose; she couldn't find her face, much less her nose, and she also failed in this when asked to do it with both hands. When she was asked to walk she staggered. The police made every effort to find a physician, but without success. There is no such evidence in the case sub judice.
In the present case the road apparently was unfamiliar to the defendant and there is no evidence that his car was *606 weaving from side to side after it "took off," as Officer Grickowski stated. Furthermore, no clinical tests were given to the defendant at headquarters. He was not given the Romberg test or the finger-to-nose test or any other clinical test, or any test to determine intoxication except the Drunk-O-Meter test; nor was he asked to walk a straight line. The evidence is to the effect that no doctor was called because he consented to take the Drunk-O-Meter test. Furthermore, there is no evidence that he staggered into headquarters or needed assistance in any way.
There is evidence introduced by the State that he was very polite in talking to the officers and was also co-operative; that he answered all questions asked of him; that the defendant gave the correct time and date; that the defendant signed a slip consenting to the Drunk-O-Meter test after first getting his glasses for this purpose; in fact, Officer Ryan on cross-examination testified that the defendant was neatly dressed and Mr. Brady testified that the signature of the defendant to the consent form was clear.
The defendant testified that he had several glasses of beer; that he had left Duke's Tavern, and as he was driving toward the Legion Post  after traveling approximately six or seven blocks  a police car cut him off and the officer got out and said "You're drunk." The defendant said that he denied this, and when the officer said he crossed the line five or six times the defendant denied this also. He testified that he told the officer he would not argue with him; that the officer refused to permit him to park his car correctly; that he walked to the rear of his car, handed over his driver's license and went back into his own car at the officer's request; he said that he signed a consent at headquarters to take the Drunk-O-Meter test after getting his glasses. He denied that he was drunk and stated that while Officer Ryan was making the test, Officer Grickowski asked him his name, age, date of birth, etc., and also the time which he said was "twenty-five to one."
In prosecution for operating a motor vehicle while under the influence of intoxicating liquor, the burden of *607 establishing guilt of the defendant beyond a reasonable doubt is upon the State. State v. Matchok, 14 N.J. Super. 359 (App. Div. 1951); State v. Glynn, 20 N.J. Super. 20 (App. Div. 1953).
In the case of Jones v. State, 159 Tex. Cr. R. 29, 261 S.W.2d 161, 163 (Tex. Crim. App. 1953), the court held that it has always permitted witnesses to testify that they smelled defendant's breath and it had an odor of alcohol; that they saw him walk and heard him talk, when he did so, and such evidence is considered valuable. The accuracy of such evidence, which of necessity involves the opinions of witnesses, is not comparable to that given by the scientist, provided that the scientific conclusion is accepted as true. The court further held that to judge the extent of the intoxication by smelling the breath may not always be right. The way one walks or talks is admissible, but the witness will err in some cases.
In the case of State v. Matchok, supra, the defendant had been in a serious accident in which he sustained shock and painful injuries. The doctor testified that he believed him to be under the influence of intoxicating liquor and not fit to drive a motor vehicle. The court, 14 N.J. Super., at pages 362-363, said:
"Further, in view of modern scientific advances and such known methods as the Harger Breath Test, the Drunkometer, chemical analysis of blood, urine and other body substances, P.L. 1951, c. 23, sec. 30, it is difficult to reconcile Dr. Offenkranz' expert status with his testimony that he knew of only four basic tests for intoxication: speech, gait, reflexes and contact with environment."
The police officers and the defendant differ as to the time the defendant was apprehended and also as to the time the test was made. The police state that he was apprehended a few minutes after 1 o'clock in the morning and that the test was completed at 1:40 A.M. The defendant testified that he was apprehended at 12 o'clock midnight and that the test was in progress at headquarters at 12:35. He further testified that at this time Officer *608 Grickowski asked him the time and he said that it was twenty-five to one. This was not denied by the officer. In fact, on cross-examination Officer Grickowski testified that while at headquarters the defendant gave him the correct time and date.
Perhaps if some witnesses who were at Duke's Tavern on the night of August 6, 1956 were called, they might have given testimony as to the time the defendant and his friend left there. However, no witnesses were called by either side for this purpose, so the question concerning the time that the defendant was apprehended and tested seems to be in doubt.
The police officers from their observation of the defendant concluded that he was under the influence of liquor. However, this court is not satisfied that their conclusions were based on sufficient and adequate evidence. Such evidence cannot be accepted as proof beyond a reasonable doubt, especially after considering all the evidence in this matter.
Reasonable doubt is that state of the case which, after comparison and consideration of all the evidence, leaves the minds of the jurors (or the court) in such a state that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge. Reasonable doubt may be engendered by lack of evidence. If the State has failed to prove evidence sufficient to satisfy the jury (or court) of the guilt of the defendant beyond a reasonable doubt, the defendant would be entitled to an acquittal even though that doubt may be engendered merely by lack of production of evidence by the State. Furthermore, if the evidence bearing upon the guilt or innocence of the accused is reasonably susceptible of two constructions, one of guilt and one of innocence of the accused, the latter should be adopted. A proceeding for violation of N.J.S.A. 39:4-50 is quasi-criminal in nature and must be so conducted as to respect and safeguard the rights of the accused. State v. Hunter, 4 N.J. Super. 531 (App. Div. 1949); affirmed 12 N.J. Super. 128 (App. Div. 1951). See also, Sharkey v. Wilkinson, 133 N.J.L. 176 (Sup. Ct. 1945).
*609 Any personal opinion this court may have as to the facts not proven cannot properly be considered as a basis for a verdict. This court may believe that a certain fact exists, but it can only act upon evidence introduced at the trial, and from that evidence and that evidence alone the court must render its verdict.
Therefore, it is the finding of this court that in view of the foregoing the State has failed to prove beyond a reasonable doubt that the defendant was guilty of driving a motor vehicle while under the influence of intoxicating liquor, in violation of N.J.S.A. 39:4-50.
A judgment of acquittal is hereby entered in this trial de novo.